62 A.3d 200

Tori TOLIVER, et al.

v.

Gary WAICKER.

No. 2245, Sept. Term, 2011.

Court of Special Appeals of Maryland.

March 1, 2013.

Brian S. Brown (Saul E. Kerpelman & Associates, PA, on the brief), Baltimore, MD., for Appellant.

James A. Rothschild (Evelyn C. Lombardo, Anderson, Coe & King, LLP, on the brief), Baltimore, MD., for Appellee.

Panel: KRAUSER, C.J., GRAEFF and J. FREDERICK SHARER, (Retired, specially assigned), JJ.

GRAEFF, J.

This appeal arises out of an order of the Circuit Court for Baltimore City granting summary judgment in favor of Gary Waicker, appellee/cross-appellant and against Tori Toliver and Shana Parker, appellants/cross-appellees ("appellants") in a

lead paint case.[1] At issue in the circuit court was whether there was a factual basis to support a finding of personal liability against Mr. Waicker for injuries allegedly suffered by appellants. The circuit court concluded that there was not, but sanctions for the filing of the suit were not warranted.

On appeal, each party presents one question for our review. Appellant presents the following question, which we have rephrased slightly:

Did the circuit court err in granting Mr. Waicker's Motion for Summary Judgment because there is evidence from which a jury could find that Mr. Waicker was an "operator" of the subject property?

In a cross-appeal, Mr. Waicker, who moved for sanctions against appellants' counsel in the circuit court, raises the following question, which we have rephrased:

Did the circuit court err in failing to award sanctions against appellants for filing the complaint without substantial factual or legal justification?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 3, 2009, Renee Baytop, mother of Tori Toliver, born November 6, 1988, and Shana Parker, born December 9, 1990, filed a Complaint in the Circuit Court for Baltimore City against Mr. Waicker, individually, Investment Realty Specialists, Inc. ("IRS"), and four other individuals.[2] The Complaint alleged negligence and a violation of the Maryland Consumer Protection Act ("CPA"), Md.Code (2005 Repl.Vol.) § 13–408 of the Commercial Law Article ("CL"), stating that,

---

1. Property Owners Association of Maryland, Inc. and Maryland Multi-Housing Association submitted Amici Curiae briefs on behalf of Mr. Waicker.

2. The other named defendants—Malmer and Sandy Gholson and/or The Estates of Malmer and Sandy Gholson, William Mosley, and Glenn Bullock—are not parties to this appeal.

*inter alia,* they were exposed to chipping, peeling and/or flaking lead paint from 1988–1995 when they lived in and/or frequented a residential property located at 1608 N. Chapel Street in Baltimore, Maryland (the "Property"). The Complaint alleged that the Property was owned and/or controlled and/or managed, either individually or by the use of agents, servants and/or employees by the defendants, and that as a result of that lead exposure, the children were permanently injured. In the alternative, appellants alleged that the defendants, "if sued in the capacity of a present or former corporate officer of a corporation which owned the said property, did personally participate in, inspire and/or induce the tortious acts or omissions complained of." In support of their CPA claim, appellants alleged that, at the time the defendants leased the Property to Ms. Baytop, the defendants or the defendants' agents knew that the dwelling contained flaking, loose or peeling paint and was unfit for human habitation, but they "impliedly represented that the dwelling was in compliance" with the Baltimore City Housing Code (the "Housing Code")[3] and other applicable laws.

On November 17, 2010, Mr. Waicker filed a Motion for Summary Judgment, appending his affidavit as an exhibit and asserting that he never owned or operated the Property. He further asserted that he could not be held personally liable for any torts of IRS because, even though he was a corporate officer of IRS, i.e., President, he had no "day-to-day operational duties with regard to rentals or maintenance," and he "did not actively participate in, specifically direct or cooperate in the rental or maintenance of" the Property. He also asserted that he was not the landlord of the Property and made no representations about the condition of the Property to anyone; thus, he had no personal liability under the CPA. On January 5, 2011, that motion was denied without prejudice, based on

---

3. When we refer to the Housing Code, we are referring to the Housing Code as it existed during the time period applicable to this case, i.e., 1988–1995.

the parties' agreement to schedule a deposition of Mr. Waicker.

On April 28, 2011, after Mr. Waicker was deposed, he filed another Motion for Summary Judgment, setting forth the same arguments as in his November 17 motion, and appending his original affidavit and his deposition testimony as exhibits. This motion included, as did the original motion, a Request for Sanctions against appellants' counsel, on the ground that he was "being sued in this case for no other purpose but harassment."

Mr. Waicker's sworn affidavit and deposition testimony comprise the material facts of this case,[4] which are not in dispute. The following is a summary of those documents.

During all relevant time periods, Mr. Waicker was the President and sole stockholder of IRS, a Maryland corporation engaged in the management of residential properties for property owners under residential management agreements. Mr. Waicker's duties as President were to oversee the financial affairs of the corporation; he was not an employee of IRS.

From 1985–1995, IRS managed more than six hundred properties for property owners. Mr. Waicker hired employees on behalf of IRS. The employees hired as property managers were in charge of managing the properties and overseeing all inspections, maintenance, and repairs needed for the properties managed by IRS. IRS had only one property manager at any one time, and that employee managed all of IRS's properties. Several other employees of IRS were involved in renting the properties for the property owners, maintaining property records, taking rental collections, distributing keys to rental properties, and answering phones. Mr. Waicker did not "run" IRS. Rather, the "employees that were either the managers inside [and] . . . the outside property manager" ran IRS.

---

4. Appellants did not offer any affidavits or sworn testimony to contradict Mr. Waicker's testimony.

**58**

William Mosley was the property manager for IRS during the relevant time period. Mr. Waicker did not tell him specifically what his duties were, nor did he "put any policies in place." He merely advised Mr. Mosley "that the properties were to be maintained [in compliance with] the . . . Housing Code. That was the marching orders I would say." Mr. Waicker did not conduct any type of verification to make sure that Mr. Mosley was keeping the properties in compliance, but IRS did not receive any housing court notices stating that the properties were not in compliance, which "indicated that [Mr. Mosley] was doing his job and he was doing it well." Although Mr. Waicker was not aware of Mr. Mosley's routine in conducting inspections of IRS-managed properties, he thought that Mr. Mosley conducted inspections to ensure properties were in compliance: (1) whenever Mr. Mosley "went out to verify that a repair was necessary or that a repair was completed"; or (2) during mandatory yearly inspections. Other than those situations, Mr. Waicker did not know when compliance inspections occurred. The owners of the properties managed by IRS had the authority to give Mr. Mosley directives specific to their properties, as did city officials and inspectors.

Sandy Gholson, the owner of the Property during the relevant time period, entered into a "Residential Management Agreement" ("RMA") with IRS, as his agent, to manage the Property and one other property not at issue in this case. Pursuant to the RMA, IRS was to, *inter alia*, procure tenants for vacancies, collect rents, and attend to the making of necessary and proper repairs to the Property. The RMA was signed by Mr. Gholson and by Kathy Smith, an employee of IRS.

Mr. Waicker had no knowledge or information about the condition of the Property while it was being managed by IRS, nor was he personally involved in any way with, or informed or consulted about, the rental or maintenance of the Property. Mr. Waicker was not involved in the management of the Property, he did not act, direct or participate in any decisions with regard to the rental or maintenance of the Property, nor

did he have any ownership interest in, or title to, the Property. Mr. Waicker did own the building where IRS kept its offices.

On November 29, 2010, appellants filed a response to Mr. Waicker's Motion for Summary Judgment, asserting that Article 13, § 310(a) of the Housing Code imposed statutory duties on both "owners" and "operators" of rental properties, and there was evidence from which a finder of fact could determine that Mr. Waicker was an "operator" of the Property, as that term is defined by Article 13, § 105(a) of the Housing Code. Specifically, appellants asserted that the "evidence in this case clearly shows that [Mr. Waicker] had 'charge, care or control' of the subject property," which rendered him an "operator" and therefore, he was "responsible for compliance with the [Housing] Code and is subject to personal liability for his failure to comply." Appellants further asserted that Mr. Waicker's Request for Sanctions should be denied.

On December 22, 2010, Mr. Waicker filed a reply to appellants' response. He asserted that the "operator" of the Property was IRS, and because there was no evidence that he "participated, inspired or committed the tort of failing to abate condition of loose, chipping or flaking lead paint" at the Property, and he did not specifically direct that any acts be done with respect to the Property, he was not liable, in his capacity as a corporate officer, for any torts committed by the corporation. With respect to the issue of sanctions, Mr. Waicker asserted that appellants' counsel was aware that the circuit court had "consistently ruled since the 1990s that [he] has no personal liability in lead paint cases in his position as President of IRS where he had no personal involvement in the rental, repair or maintenance of the property at which the alleged lead paint injuries occurred." He argued that appellants' counsel's continued attempts to seek to impose personal liability upon him were in bad faith and without substantial justification.

On June 1, 2011, the court held a hearing on Mr. Waicker's Motion for Summary Judgment and Request for Sanctions. At the conclusion of the hearing, the court granted the Motion

for Summary Judgment, without articulating its reasoning, and it denied the Request for Sanctions.

On December 9, 2011, the court dismissed all remaining defendants in the case. This timely appeal followed.

## STANDARD OF REVIEW

Maryland Rule 2–501(f) governs motions for summary judgment and provides that a trial court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." *Accord Reiter v. Pneumo Abex, LLC,* 417 Md. 57, 67 (2010). A determination of "[w]hether a circuit court's grant of summary judgment is proper in a particular case is a question of law, subject to a non-deferential review on appeal." *Tyler v. City of College Park,* 415 Md. 475, 498 (2010). Thus, the standard of review of a trial court's grant of a motion for summary judgement on the law is *de novo. D'Aoust v. Diamond,* 424 Md. 549, 574 (2012). When we consider a circuit court's order granting summary judgment, we "review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Rhoads v. Sommer,* 401 Md. 131, 148, 931 A.2d 508 (2007). *Accord Reiter,* 417 Md. at 67 (" '[W]e independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law.' ") (quoting *Livesay v. Baltimore County,* 384 Md. 1, 10, 862 A.2d 33 (2004)).

## DISCUSSION

### I.

Appellants contend that the circuit court erred in granting Mr. Waicker's motion for summary judgment. In assessing that contention, we must assess whether Mr. Waicker falls

within the class of individuals who can be held personally liable for the negligence and consumer protection violations alleged in this case.

## A.

### General Principles of Liability of Corporate Officers

 Mr. Waicker argues that, "as President of IRS, [he] is not liable for alleged torts committed by employees of IRS." The principle that he asserts, that an officer of a corporation is personally liable for the torts of a corporation only in limited circumstances, is correct. As the Court of Appeals has made clear, the general rule is that an officer of a corporation is liable for the negligence of the corporation only where there was, on " 'his part[,] such a breach of duty as contributed to, or helped to bring about, the injury; he must have been a participant in the wrongful act.' " *Metromedia Co. v. WCBM Maryland, Inc.*, 327 Md. 514, 520, 610 A.2d 791 (1992) (quoting *Tedrow v. Deskin*, 265 Md. 546, 551, 290 A.2d 799 (1972)). Thus, an officer may be liable for the torts that he personally commits, inspires, or participates in, even though performed in the name of the corporation. *Allen v. Dackman*, 413 Md. 132, 153, 991 A.2d 1216 (2010). The officer may also be liable "when he or she 'is present on a daily basis during commission of the tort and gives direct orders that cause commission of the tort.' " *Id.* (quoting *MaryCLE v. First Choice*, 166 Md. App. 481, 528, 890 A.2d 818 (2006)).

Appellants do not dispute these general principles. They assert, however, that these principles are irrelevant because they are not seeking to hold Mr. Waicker liable for the torts of the corporation. Rather, they are seeking to hold Mr. Waicker personally liable for his own torts under the specific provisions of the Housing Code.

## B.

### Baltimore City Housing Code

The stated purpose of the Housing Code "is to establish and maintain basic minimum requirements, standards, and condi-

tions essential for the protection of the health, safety, morals, and general welfare of the public and of the owners and occupants of dwellings in the City of Baltimore," to "establish minimum standards governing the condition, use, operation, occupancy and maintenance of dwellings . . . in order to make dwellings safe, sanitary and fit for human habitation," and to "fix certain responsibilities and duties of owners, operators, agents and occupants of dwellings." BALT. CITY CODE art. 13, § 103.[5] The Housing Code is "remedial and essential to the public interest," and it should "be liberally construed to effectuate" its purposes. *Id.*

To carry out the stated purposes, the Housing Code "established liability for entities that failed to follow the Code's requirements." *Allen,* 413 Md. at 143, 991 A.2d 1216. Section 310 of the Housing Code sets forth two separate classes of individuals that are liable for a violation of the Housing Code: (a) "owners and operators"; and (b) "corporate officers and directors." BALT. CITY CODE art. 13, § 310.

Section 310(a) sets forth the responsibility of owners and operators. It provides as follows:

> Any person who is either an owner or operator of a property subject to this Code shall be responsible for compliance with all of the provisions of this Code. No owner or operator shall be responsible for compliance with Chapter 9, "Responsibilities of Occupants", unless that person also is an occupant of the property. Where, such as in Chapter 10, this Code states a responsibility to be that of the owner, it shall also be that of any person who is an operator of the property in his behalf. An owner shall be held liable for all violations of this Code, in connection with any land, buildings, structure, or matter or thing owned or operated by

---

**5.** The Housing Code requires, among other things, that all buildings occupied as a dwelling shall be kept in "good repair [and] safe condition," including that "[a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose, or peeling paint and paper." BALT. CITY CODE art. 13, §§ 702(a); 703(c).

him, and for any expenses incurred by the Mayor and City Council pursuant to Sections 302, 303, or 311 of this Code.

Section 310(b) addresses the responsibility of corporate officers and directors. It provides:

(b) *Responsibility of corporate officers and directors.* Whenever a corporation shall violate any of the provisions of this Code, such violation shall be deemed to be also that of the individual directors, officers or agents of such corporation who shall have **authorized, ordered or done** any of the acts constituting in whole or in part such violation or who shall **knowingly** have **acquiesced** in any failure to act constituting in whole or in part such violation, and such violation shall be deemed a misdemeanor, and upon conviction therefor, any such director, officer or agent shall be punishable to the same extent as is provided in Section 307 of this Code.

(Emphasis added).

Appellants contend that Mr. Waicker is personally liable as an "operator" pursuant to § 310(a). They contend that the term "operator" should be broadly construed, and that given such a construction, Mr. Waicker, individually, was an operator bound by the duties imposed by the Code.

Mr. Waicker contends that IRS was the "operator" of the Property, that his duties as President of IRS did not make him an "operator," and pursuant to § 310(b), he can be held personally liable for any violation of the Housing Code only if he "specifically directed the particular act, participated, or cooperated therein." He argues that there was no evidence presented that could show personal liability against him under the Housing Code.

Where, as here, our review involves the interpretation of a statute, "[o]ur goal is to 'ascertain and effectuate the intent of the Legislature.'" *Md. Ins. Comm'r v. Cent. Acceptance Corp.*, 424 Md. 1, 36, 33 A.3d 949 (2011) (quoting *Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park*, 392 Md. 301, 316, 896 A.2d 1036 (2006)). In doing so, "we look first to the language of the statute, giving it its

natural and ordinary meaning." *State Dep't of Assessments and Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13, 702 A.2d 690 (1997). "If the language is clear and unambiguous on its face, our inquiry ends." *Forster v. Office of Pub. Defender*, 426 Md. 565, 580, 45 A.3d 180 (2012). *Accord Montgomery County v. FOP*, 427 Md. 561, 572, 50 A.3d 579 (2012) (" 'If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.' ") (quoting *Dep't of Human Res. v. Hayward*, 426 Md. 638, 650, 45 A.3d 224 (2012)). We may neither add nor delete language to reflect an intent not evidenced in the unambiguous language of a statute, nor may we construe the statute with forced or subtle interpretations that limit or extend its application. *Dyer v. Otis Warren Real Estate Co.*, 371 Md. 576, 581, 810 A.2d 938 (2002).

On the other hand, if the language of the statute is ambiguous, the " 'courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of [the] enactment [under consideration].' " *Stoddard v. State*, 395 Md. 653, 662, 911 A.2d 1245 (2006) (quoting *FOP v. Mehrling*, 343 Md. 155, 174, 680 A.2d 1052 (1996)). An ambiguity exists when there are "two or more reasonable alternative interpretations of the statute." *Chow v. State*, 393 Md. 431, 444, 903 A.2d 388 (2006) (quotation omitted). In that event, an appellate court will resolve the ambiguity by looking to the statute's legislative history, case law, and statutory purpose, avoiding a construction of the statute that is " 'unreasonable, illogical, or inconsistent with common sense.' " *Stoddard*, 395 Md. at 663, 911 A.2d 1245 (quoting *Blake v. State*, 395 Md. 213, 224, 909 A.2d 1020 (2006)).

### 1.

### Operator

An "operator" is defined in the Housing Code as

*any person who has charge, care or control of a building,* or part thereof, in which dwelling units or rooming units are let or offered for occupancy, and shall include a lessee, sublessee, any vendee in possession, *or any other person otherwise managing or operating such building, or part thereof.*

BALT. CITY CODE art. 13, § 105 (emphasis added).

Appellants contend that, pursuant to this definition, there was sufficient evidence of Mr. Waicker's involvement with the Property "for the trier of fact to determine that [he] was an 'operator' as that term is defined by the Housing Code." They assert that there was "ample evidence" that Mr. Waicker had " 'charge, care and control' " of the Property or otherwise managed the Property. In support of that assertion, they contend that Mr. Waicker: (1) "decided the maintenance policies (the 'marching orders') for IRS, the entity hired to manage" the Property; (2) "ran its day-to-day affairs"; (3) "was the only stockholder of IRS"; (4) "received the profits from IRS"; (5) "was the only person who hired the employees of IRS and directed their actions"; and (6) "most importantly," "established policies concerning hazardous chipping, peeling and flaking paint" at the Property. Appellants argue that "[t]hese actions are the very essence of management, operation and control."

Mr. Waicker argues that he was not an operator, as that term is defined in the Housing Code. As indicated, he asserts that IRS was the operator of the Property, noting that IRS entered into the agreement with the Property owner to manage the Property, IRS employees procured tenants and collected the rents, and Mr. Mosley, IRS's property manager, was responsible for making necessary and proper repairs to the Property. Mr. Waicker contends that appellants presented no evidence that he had "care, custody, or control" of the Property, and therefore, he could not be subject to personal liability as an operator.

Mr. Waicker's argument that he was not an operator is supported by this Court's decision in *Shipley v. Perlberg,* 140 Md.App. 257, 278, 780 A.2d 396, *cert. denied,* 367 Md. 90, 785 A.2d 1293 (2001). In *Shipley,* this Court held that a corporate

officer was not individually liable as an operator for lead paint injuries to a resident of a corporately owned property. The Court noted that the officer was "not involved in renting properties and had never visited the subject property," and therefore, there was no evidence that he had "charge, care or control over the property." *Id.*

Similarly, here, there was no evidence to support a finding that Mr. Waicker was an operator pursuant to the Housing Code. It is undisputed that IRS, not Mr. Waicker, entered into the agreement with the owner to manage the Property. And although Mr. Waicker, as President of IRS, hired Mr. Mosley as the property manager, it was Mr. Mosley who was responsible for making the necessary repairs. Mr. Waicker told Mr. Mosley to comply with the Housing Code, but he was not involved in the day-to-day operations of the Property. Mr. Waicker was not managing the Property, and he did not have "charge, care or control" of the Property.[6]

Appellants suggest, however, that the Court of Appeals subsequently cast doubt on this Court's decision in *Shipley*. In *Allen*, 413 Md. at 141, 991 A.2d 1216, the Court held that a reasonable trier of fact could find that Mr. Dackman was an "owner" of the property, as the Housing Code defined that term.[7] In so holding, the Court concluded that the City

---

6. As the amicus brief filed by the Property Owners Association of Maryland, Inc., notes:

 The plain language of [BALTIMORE CITY CODE art. 13, § 105] defines "operator" as a person who has "charge, care or control *of a building*," not "charge, care or control *of the corporation that manages the building*." (emphasis added). The Section goes on to include "any other person otherwise managing or operating *such building*," not "any other person otherwise managing or operating *the corporation that manages such building*." (emphasis added). Appellants' argument would require the Court to re-write the Housing Code to insert words that are not there, in violation of settled rules of statutory construction. *See Bridges v. Nicely*, 304 Md. 1, 10–11 [497 A.2d 142] ("where the language of a statute is clear, courts may not insert or omit words to make the statute express an intention not evident in its original form") (1985) (citations omitted).

7. The Court of Appeals expressed no opinion on whether Mr. Dackman may have been an operator of the property because the petitioners did

Council intended the term "owner" in the Housing Code to "have a broader meaning than it does in the traditional sense," noting that the definition of the term "owner" encompassed not only "those who actually own the title to a dwelling," but also "those who 'hold[ ] or control[ ]' that title as well." *Id.* at 148, 991 A.2d 1216 (quoting BALT. CITY CODE art. 13 § 105(jj)).

The Court held that a trier of fact could determine that Mr. Dackman had the ability to "control the title to" the property because: (1) Mr. Dackman ran the "day-to-day affairs of Hard Assets during the time period when Hard Assets both acquired and sold" the property; (2) he signed the deed certification when Hard Assets acquired the property; (3) he signed the complaint seeking to remove the petitioners from the property; and (4) he signed the deed when Hard Assets sold the property. *Id.* at 149–50, 991 A.2d 1216. Moreover, even if Mr. Dackman did not actually direct those actions, the trier of fact could find that he had the "ability" to do so, which would have been sufficient to establish that he controlled the title to the property. *Id.* at 150, 991 A.2d 1216. Significant to the Court was the lack of evidence that "anyone other than [Mr. Dackman] was responsible for the day-to-day management of Hard Assets or for decisions affecting the title to the property, which supports that conclusion that [he] was the person who made" those decisions. *Id.*

Appellants argue that the Court in *Allen* gave the term "owner" a broad interpretation after taking note that the Housing Code was "remedial and should be liberally construed." They urge us to construe the term operator in a similarly broad fashion, asserting that "[t]here is simply no reason to believe … that the City Council intended the term 'owner' to be broadly construed, while at the same time, intended for the term 'operator' to be narrowly construed."

We note that, in *Allen,* 413 Md. at 148, 991 A.2d 1216, the Court of Appeals construed the term "owner" in the Housing

---

not advance that argument. *Allen v. Dackman,* 413 Md. 132, 145 n. 9, 991 A.2d 1216 (2010).

Code in a broad manner based on the definition in the Housing Code, concluding that the definition showed an intent for an expanded meaning, including not only those owning title to a dwelling, but also those who hold or control title. Appellants argue that the definition of "operator," any person who "has charge, care or control of a building ... or any other person otherwise managing or operating such building," similarly provides for an expanded meaning of "operator."

The question, though, is whether Mr. Waicker meets this definition. Appellants contend that, in the same way that Mr. Dackman controlled title, Mr. Waicker had "control" of the Property.

The record does not support this assertion. As indicated, IRS, by its agreement, was responsible for the management of the Property. Mr. Waicker, as President of IRS, was solely responsible for overseeing the financial affairs of the corporation. IRS employed property managers, who were in charge of managing 600 properties and overseeing all inspections, maintenance, and repairs needed for the properties managed by IRS, and individuals to handle renting the properties for the property owners. Mr. Waicker testified that the employees ran IRS, not Mr. Waicker.

Mr. Waicker testified that he did not advise Mr. Mosley, the property manager during the relevant time period, what his duties were, nor did he "put any policies in place." Rather, his sole instruction to Mr. Mosley was to comply with the Housing Code. Mr. Waicker did not conduct any type of verification to make sure that Mr. Mosley was keeping the properties in compliance, he was not aware of Mr. Mosley's routine in conducting inspections of IRS managed properties, and he did not direct Mr. Mosley's maintenance of the properties. In other words, it was up to Mr. Mosley to determine what actions were necessary to comply with the Housing Code.

Mr. Waicker had no knowledge or information about the condition of the Property while it was being managed by IRS, nor was he personally involved with, or informed or consulted

about, the rental or maintenance of the Property. He was not involved in the day-to-day operations of the Property.

To be found to have "charge, care or control" over property, a person must have some involvement in the decision making regarding the operation of the property. There was no evidence in this case that Mr. Waicker personally was involved in such decision making. Accordingly, a rational trier of fact could not find that Mr. Waicker qualified as an operator. The circuit court properly granted summary judgment in his favor.

**2.**

**Corporate Officers**

■ Even if Mr. Waicker was an operator, however, summary judgment was still proper because there was no evidence permitting a rational trier of fact to find him liable for a violation of the Housing Code. In *Shipley,* 140 Md.App. at 278–79, 780 A.2d 396, Judge Sally Adkins, writing for this Court, made clear that a mere finding that a corporate officer was an "operator" did not translate into a finding that the officer was liable for a violation of the Housing Code. Noting that § 310(b) provides that an officer of a corporation is liable only when the officer has "authorized, ordered or done any of the acts constituting in whole or in part such violation or who shall knowingly have acquiesced in any failure to act constituting in whole or in part such violation," this Court stated:

> To prove liability under section 310(b), a plaintiff must show that the individual defendant at least had knowledge of and acquiesced in the wrong committed. To hold a person liable under section 310(a) merely because he or she was involved in setting up a corporation, or acted as officer or director, would be inconsistent with the requirements of section 310(b). We will not interpret section 310 in a manner that promotes this inconsistency. *See, e.g., Barr v. State,* 101 Md.App. 681, 687, 647 A.2d 1293 (1994) ("courts must read all parts of a statute together, with a view toward harmonizing the various parts and avoiding both inconsistencies and senseless results that could not reasonably have been in-

tended by the Legislature"). We hold, therefore, that Perlberg is not liable under section 310(a) of the Baltimore City Code.

*Id.*

The Court of Appeals in *Allen,* 413 Md. at 152, 991 A.2d 1216, agreed with this conclusion, noting that a corporate officer is not personally liable for an alleged violation of the Housing Code unless he or she personally committed, inspired, or participated in "the alleged violations." In concluding that a rational trier of fact could find that Mr. Dackman was personally liable for the plaintiffs' alleged injuries, the Court noted that he "managed Hard Assets' day-to-day affairs during the period that Hard Assets owned the property, and there [was] no evidence that anyone else managed those affairs during that period." *Id.* at 155, 991 A.2d 1216.

In this case, by contrast, Mr. Waicker did not manage the day-to-day affairs of the corporation, nor was he involved in the day-to-day decisions regarding the rental or maintenance of the properties managed by the corporation. And there was evidence that other individuals were responsible for those duties. There was no evidence from which a reasonable trier of fact could determine that Mr. Waicker personally committed, inspired, or participated in the alleged tort in this case. The circuit court properly granted Mr. Waicker's Motion for Summary Judgment.

## II.

### Sanctions

In a cross-appeal, Mr. Waicker argues that the trial court erred in denying his Motion for Sanctions. He contends that appellants' counsel did not have substantial factual or legal justification to bring the Complaint against him, asserting that, over the last fifteen years, appellants' counsel has filed repeated lawsuits against Mr. Waicker in lead paint cases, which consistently have resulted in summary judgment in Mr. Waicker's favor because Mr. Waicker had no personal involvement in the rental or maintenance of those properties.

Mr. Waicker asserts that appellants' counsel was aware that there was no reasonable basis for believing that the Complaint in this case would generate an issue of fact, and therefore, sanctions were warranted.

Appellants, not surprisingly, disagree. They contend that the trial court properly denied the motion for sanctions, asserting that "there is more than 'sufficient evidence' to support the trial court's decision that [a]ppellants' counsel did not bring the instant action in bad faith or without substantial justification."

■ Maryland Rule 1–341 provides:

In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it.

"Rule 1–341 should be used sparingly because granting an award of attorney's fees under it is an extraordinary remedy." *RTKL Assoc., Inc. v. Baltimore County,* 147 Md.App. 647, 658, 810 A.2d 512 (2002).

■ We have explained that, "[i]n the context of Rule 1–341, bad faith exists when a party litigates with the purpose of intentional harassment or unreasonable delay." *Barnes v. Rosenthal Toyota, Inc.,* 126 Md.App. 97, 105, 727 A.2d 431 (1999). In analyzing whether an attorney lacked substantial justification to file a claim, the issue is " 'whether [the attorney] had a *reasonable basis* for believing that the claims would generate an issue of fact.' " *RTKL,* 147 Md.App. at 658, 810 A.2d 512 (quoting *Inlet Assocs. v. Harrison Inn Inlet, Inc.,* 324 Md. 254, 268, 596 A.2d 1049 (1991)). We review a circuit court's determination whether a party maintained or defended an action in bad faith or without substantial justification under a clearly erroneous standard. *Garcia v. Foulger Pratt Dev., Inc.,* 155 Md.App. 634, 677, 845 A.2d 16 (2003).

Here, at the conclusion of the motions hearing, the court stated that, although it was granting the motion for summary judgment, it was "denying the Motion[ ] for Sanctions for Harassment." The court explained:

I think based upon the status of the law, I don't think that is even is close to something that is in the category of harassment or sanctions. I think ... I can't say that I would be shocked if ... my decision was reversed on appeal and—so I just really want to be clear about that.

\* \* \*

You know, I think ... there's a fair question here based upon the status of the law as it is now. I also think that based upon what my job is, is that to go forward with my understanding of the law and my understanding is it leads me to grant the motion [for summary judgment] but I wanted to be clear about that.

The circuit court made clear its belief, echoed by counsel for appellant at oral argument, that the Court of Appeals' decision in *Allen* left open the question whether a corporate officer in general, and Mr. Waicker in particular, could be found liable as an "operator." Thus, the court did not consider the filing of the Complaint to be unreasonable and worthy of the extraordinary remedy of sanctions. We perceive no error.

**JUDGMENT GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION FOR SANCTIONS AFFIRMED. COSTS TO BE PAID 50% BY APPELLANTS AND 50% BY APPELLEE.**